

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-15-00338-CR

ANTWAN JAMAAL HAWKINS                                    APPELLANT

V.

THE STATE OF TEXAS                                            STATE

----------

## FROM THE 297TH DISTRICT COURT OF TARRANT COUNTY
## TRIAL COURT NO. 1329290D

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

Appellant Antwan Jamaal Hawkins appeals his two convictions for aggravated assault with a deadly weapon. In three points, Hawkins argues that the trial court committed reversible error and commented on the weight of the evidence by including in its charge to the jury that flight inferred guilt; that his

---

[1]*See* Tex. R. App. P. 47.4.

judgments should be reformed to remove the jury's assessed fines because the trial court failed to pronounce them orally; and that his rights to due process and due course of law were violated when the trial court included, in its charge to the jury at the punishment phase, the statutory instruction regarding the impact of good-conduct time on a defendant's incarceration. We will affirm.

## II. BACKGROUND

After the State charged Hawkins with two counts of aggravated assault with a deadly weapon, trial was set for April 20, 2015, but Hawkins failed to appear. The trial court issued a warrant for Hawkins's arrest. After he was apprehended, trial commenced on July 29, 2015.

At trial, Shawn Thompson testified that he was working as a bouncer at Illusions Club in Fort Worth on March 13, 2013. According to Thompson, he, his manager, and a "barback" went outside the club to inform Hawkins that his former girlfriend, Brooke Benham, would not need him to drive her home after she finished her shift at the club. Thompson said that Hawkins was in a "Black Pontiac" and admitted that he had a gun in his trunk. Thompson also said that he gave Benham a ride home that night and that he had intended to help her change her locks at her residence that same night.

Thompson said that after work, and while he and Benham were en route to retrieve new locks from a property he managed during the day, he saw "a vehicle some great distance behind [him] that began closing quickly." Thompson said

2

that at that point, he could tell that the vehicle was a Pontiac and that within seconds he recognized the vehicle as the one he had seen Hawkins in earlier.

Thompson said that he slowed onto the shoulder and that Hawkins came up "immediately alongside" the driver's side of Thompson's truck. Thompson said that he could very clearly see that the driver of the car was Hawkins. Thompson said that as he made eye contact with Hawkins, Hawkins pointed a gun at him. Thompson said that Hawkins was "yelling something [that he] couldn't make out." Thompson averred that he accelerated and veered toward Hawkins hoping to disarm him and obstruct him from having a "clear shot." By Thompson's account, Hawkins was forced to apply his brakes, which allowed Thompson to move his truck in front of Hawkins. Thompson said that he attempted to call 911 at that moment when he heard a loud noise that he felt certain was the sound of Hawkins firing the gun toward Thompson's truck. He also said that he heard what he believed was the impact of a bullet striking his truck. The State introduced a copy of Thompson's 911 call and played it for the jury.

Thompson drove to a nearby convenience store to meet with the police as they had instructed him to do when he called. Thompson said that when he exited his truck, he saw a "large bullet hole in the tailgate." The State introduced, and published to the jury, photographs depicting the bullet hole. Thompson said that later a Fort Worth Police Department crime-scene specialist came and

3

retrieved a bullet from the hole in his truck. Photographs of the projectile that was retrieved were published to the jury.

Thompson said that after speaking with the police at the convenience store, he drove Benham to her residence. Thompson averred that while en route, Benham received a phone call from Hawkins; that Benham gave the phone to Thompson; and that Thompson also spoke with Benham. Thompson recalled that he told Hawkins that he should turn himself in to the police and that Hawkins declared in "a very sarcastic" tone, "Turn myself in for what?" Thompson testified that when he dropped Benham off at her residence, he did in fact change her locks.

A few days later, Thompson gave his formal written statement to the police and he picked Hawkins out from a photo lineup. The State introduced, and published to the jury, Thompson's written statement.

Benham testified that she and Hawkins had dated "a couple years ago for about four months." By Benham's account, she was bartending at Illusions on March 13, 2013. Benham said that Hawkins had come to the club because she agreed to speak with him because she "believed it was safer for him to be up at the club than doing what he was threatening to do." She said that she had him sit at the bar and that the two talked. Benham said that their conversation was "tense" but that she was "trying to make things smoothed over." Benham averred that the topic of conversation was that Hawkins wished to be back in a relationship with her but she did not reciprocate. Benham said that Hawkins

4

stayed at the club until closing because he was going to give her a ride home. Benham averred that her boss would not allow her to leave in his car so she texted him that she would not be riding home with him. Benham also said that her boss, Thompson, and another employee went to the parking lot to explain that Benham would not be riding home with him. According to Benham, this scenario made Hawkins angry.

Benham averred that while Thompson was driving her home, at one point Thompson said, "That's your boy back there." Benham said that although things happened quickly, she did recognize that it was Hawkins and she felt the bullet hit the truck. Much like Thompson's account, Benham said that after the shooting, she and Thompson spoke to the police. Benham said that as Thompson drove her home after talking with the police, Hawkins called her. Benham said that Hawkins admitted to her in the conversation that he had shot his gun at Thompson's truck; Hawkins inquired of Benham whether she would be pressing charges; and Hawkins told Benham that the two would no longer be talking to each other. Benham said that she initially told police that she had not seen Hawkins's face but that she said this because she feared Hawkins and that she "wanted to just forget the whole thing."

Benham said that a few days after the shooting incident, Hawkins gave her a ride home from the club and they had sex. Benham said, however, that after Hawkins was arrested, he sent her a letter threatening her and Thompson not to

5

testify. Benham said that the letter's contents were what compelled her to testify at trial.

Fort Worth Police Officer David Hughes testified that as he worked the midnight shift on March 13, 2013, he and his partner heard what they believed to be a gunshot coming from the highway. At this same time, Hughes said that he received a dispatch about a shooting on the highway involving a black Pontiac. In short order, Hughes said that Thompson and Benham arrived at a local convenience store and reported to him what had happened. Hughes said that he and his partner observed the bullet hole in Thompson's truck and that his partner took a picture of the bullet hole.

Fort Worth Police Crime Scene Investigator Lori Scheiren testified that days after the incident, she took photographs of Thompson's truck and also retrieved a spent bullet from the hole in Thompson's tailgate. These photographs, as well as the recovered slug, were published to the jury. Scheiren said that she could not determine the caliber of the bullet, but she could say that it was larger than a .22-caliber bullet but smaller than a .45-caliber bullet.

During its case in chief, the State introduced court documents that demonstrated that Hawkins had missed his previous trial date in this case and that the court ordered an arrest warrant for his failure to appear. In conjunction with these documents, the State called United States Marshal Mark Thornhill, who was tasked with apprehending Hawkins. Thornhill said that he received information that Hawkins was staying in Arlington with a female Tarrant County

jailer. Thornhill averred that he and his task team executed a forceful knock-and-announce and that a K-9 dog alerted the team that Hawkins was hiding under a couch. Thornhill characterized the jailer's behavior as harboring a fugitive.

In the abstract portion of the Court's guilt-or-innocence charge, the court included the statement, "Flight is a circumstance from which an inference of guilt may be drawn." Hawkins did not object to the Court's charge, and this statement was not repeated in the application portion of the charge.

The jury returned a verdict of guilty, and after hearing punishment evidence, the jury assessed punishment at thirty years' confinement and a $1,000 fine for each count of aggravated assault with a deadly weapon. As the trial court announced punishment, this colloquy transpired:

THE COURT: Please hand the verdict to the bailiff.

Verdict Form Count 1: "We, the jury, having found the defendant, [Hawkins], guilty of the offense of aggravated assault as charged in Count 1 of the indictment, do further find the allegation in the repeat offender notice is true, we assess his punishment at 30 years in the Institutional Division of the Texas Department of Criminal Justice, and in addition, assess a fine of $1,000," signed by [the jury] foreman.

Verdict Form Count 2: "We, the jury, having found the defendant, [Hawkins], guilty of the offense of aggravated assault as charged in Count 2 of the indictment, do further find the allegation in the repeat offender notice is true. We assess his punishment at 30 years in the Institutional Division of the Texas Department of Criminal Justice, and in addition, assess a fine of $1,000," also signed by . . . the foreman of the jury.

Does either side wish the jury to be polled?

[Prosecutor]: State does not, Your Honor.

[Defense Attorney]: Defense does not, Your Honor.

THE COURT: This verdict will be received and accepted as the verdict of this Court.

Mr. Hawkins, please rise.

In Case Number 1329290, *State of Texas versus [Hawkins]*, the jury having found you guilty upon your plea of "not guilty" for the offense of aggravated assault with a deadly weapon, having found that the allegations in Enhancement Paragraph 1 are true, and having assessed your sentence at 30 years' confinement in the Correctional Institutional Division of the Texas Department of Criminal Justice, is there any legal reason why the defendant should not be sentenced at this time.

[Defense Attorney]: No, Your Honor.

THE COURT: It is, therefore, the order, judgment, and decree of this Court that the defendant, [Hawkins], is hereby sentenced to 30 years' confinement in the Institutional Division of the Texas --

[Hawkins]: Let me up out of here, man!

THE COURT: Sir, you need to be quiet.

I hereby sentence you to 30 years' confinement Institutional Division of the Texas Department of Criminal Justice there to serve your sentence as required by law.

[Hawkins]: Look how these people doing me, man!

THE COURT: Mr. Hawkins, you need to be quiet.

[Hawkins]: Man, look how these people doing me, man!

THE COURT: You need to settle down.

[Hawkins]: These people sat here and lied on me, man!

THE COURT: Mr. Hawkins, I'm not going to warn you again.

8

You have a right to appeal this case to the Second Court of Appeals located in Fort Worth, Texas. You do so by filing a written motion for new trial or notice of appeal within 30 days of this date. If you do not have the money to hire a lawyer for the appeal --

[Hawkins]: Is that how you help somebody, man? Because I don't talk like you?

THE COURT: Put him up.

[Hawkins]: Because I can't talk? Because my mama smoked crack? That's why? Man, fuck this shit, man!

THE COURT: Members of the jury, that concludes your service. Please go ahead and retire to the jury room.

[Bailiff]: All rise.

[Open court. Defendant present, no jury.]

[Defense Attorney]: I'm sorry, Your Honor.

THE COURT: We are in recess.

The trial court's written judgments reflect the jury's assessed punishment of thirty years' incarceration and a $1,000 fine for each count. This appeal followed.

## III. DISCUSSION

### A.    Instruction on Flight as an Inference of Guilt

In his first point, Hawkins argues that the trial court erred and improperly commented on the weight of the evidence in the jury charge at the guilt–innocence phase by including an instruction that flight may be considered to infer guilt. Hawkins admits that he did not object to the court's charge, but he nonetheless argues that the inclusion of the instruction caused egregious harm.

9

The State agrees that the inclusion was error, but it contends that Hawkins has failed to demonstrate that he suffered actual, rather than theoretical, harm; thus, the State contends that the trial court's error was harmless.

### 1. Standard of Review and Flight as an Instruction

"[A]ll alleged jury-charge error must be considered on appellate review regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In our review of a jury charge, we first determine whether error occurred; if error did not occur, our analysis ends. *Id.* If error occurred, whether it was preserved determines the degree of harm required for reversal. *Id.* Unpreserved charge error warrants reversal only when the error resulted in egregious harm. *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see* Tex. Code Crim. Proc. Ann. art. 36.19 (West 2006). The appropriate inquiry for egregious harm is fact specific and must be performed on a case-by-case basis. *Gelinas v. State*, 398 S.W.3d 703, 708–10 (Tex. Crim. App. 2013); *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011).

In making an egregious harm determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171. *See generally Gelinas*, 398 S.W.3d at 708–10 (applying *Almanza*). Errors that result in egregious harm are those "that

10

affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more persuasive." *Taylor*, 332 S.W.3d at 490 (citing *Almanza*, 686 S.W.2d at 172). The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused. *Almanza*, 686 S.W.2d at 174.

Neither the State nor the defendant has the burden to prove harm from charge error. It is the reviewing court's duty to assess harm from the context of the error. *Ovalle v. State*, 13 S.W.3d 774, 787 (Tex. Crim. App. 2000); *see also Warner v. State*, 245 S.W.3d 458, 464 (Tex. Crim. App. 2008) ("[W]e affirm that burdens of proof or persuasion have no place in a harm analysis conducted under *Almanza*.").

It is well-established that a jury instruction on flight is improper because it comments on the weight of the evidence. *See Clark v. State*, 36 S.W. 273, 274 (Tex. Crim. App. 1896); *Santos v. State*, 961 S.W.2d 304, 305 (Tex. App.— Houston [1st Dist.] 1997, pet. ref'd).

### 2. The Erroneous Instruction Did Not Harm Hawkins

In this case, in the abstract portion of the court's charge on guilt-innocence, the trial court included the instruction that "[f]light is a circumstance from which an inference of guilt may be drawn." After reviewing the entire jury charge, the state of the evidence, and the arguments of counsel, we conclude that the instruction in this case, albeit improper, was not harmful to Hawkins.

11

### a. The Charge as a Whole

When considering this instruction in light of the entire jury charge, absent the instruction in question, the charge is wholly unexceptional. It contains no other erroneous or questionable sections, and the application paragraph properly instructs the jury to find Hawkins guilty if it found "from the evidence beyond a reasonable doubt that . . . the defendant, [Hawkins], did intentionally or knowingly threaten imminent bodily injury to [Thompson]" and that Hawkins "did use or exhibit a deadly weapon . . . then you will find the defendant guilty of the offense of aggravated assault as charged in count one of the indictment." The charge then states "[u]nless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will find the defendant not guilty of aggravated assault as charged in count one of the indictment." These application instructions did not reference flight, and these same instructions were given to the jury regarding count two.

The charge also properly defined aggravated assault with a deadly weapon without reference to flight. *See* Tex. Penal Code Ann. § 22.02(a)(2) (West 2011). And the charge further directed the jury to resolve the issue of Hawkins's guilt based upon evidence "from the witness stand" only. We cannot conclude that the erroneous instruction reduced the State's burden of proof in any way. *See Hess v. State*, 224 S.W.3d 511, 516 (Tex. App.—Fort Worth 2007, pet ref'd) (reasoning that charge as a whole did not increase State's burden

12

despite erroneous inclusion of definition that jury could consider defendant's refusal to submit to breath test).

### b. State of the Evidence

The State presented compelling evidence of Hawkins's guilt. Two eye-witnesses, Thompson and Benham, testified that Hawkins drove his car alongside Thompson's truck prior to the truck being shot. Both eye-witnesses testified to hearing the gunshot just seconds after seeing Hawkins. Both eye-witnesses testified that there were no other vehicles on the highway at the time. And Thompson specifically testified that he saw Hawkins with a gun just prior to the shooting, and the State presented evidence that Thompson's tailgate had been shot.

In addition to this testimony, the jury heard testimony that prior to the shooting, Hawkins was upset because Benham had broken off their relationship and that the reason he was at the club prior to the shooting was because Benham believed that allowing Hawkins to come to the club to talk to her was the best way to placate Hawkins given that he had threatened her about their breakup. The testimony also revealed that Hawkins was upset that he was not allowed to drive Benham home after she finished working and that the reason he wasn't driving her home was because her coworkers were concerned for her safety, so much so that Thompson testified that, as he intended to do all along, he changed Benham's locks once he finally dropped her off at home.

Furthermore, both eye-witnesses testified that Hawkins called Benham shortly after the shooting. Benham said that in the phone conversation, Hawkins admitted to firing the shot and inquired of Benham whether she and Thompson would be pressing charges. Benham also averred that Hawkins sent her a letter threatening both her and Thompson to not testify. Moreover, Hughes testified that he heard the shot from the highway shortly before encountering Thompson and Benham and seeing the bullet hole in Thompson's truck.

Although Hawkins objected to the relevancy of the court's own documents showing that he failed to appear at his initial trial date, the trial court did not abuse its discretion by admitting these documents, and Hawkins does not argue about their admittance on appeal. *See Aguilar v. State*, 444 S.W.2d 935, 938 (Tex. Crim. App. 1969) (holding that trial court properly admitted evidence that defendant failed to appear at prior court setting). Moreover, Hawkins did not object to Thornhill's testimony regarding Thornhill's arrest of Hawkins after his failure to appear, and Hawkins even questioned Thornhill regarding whether Thornhill knew Hawkins's motives for failing to appear. And both parties addressed this evidence during their closing arguments.

We cannot conclude that given the weight of the evidence as a whole, the court's erroneous instruction caused Hawkins harm. *See Hess*, 224 S.W.3d at 516 (reasoning that although the State conceded the case was not a "slam-dunk, falling-down drunk" case, erroneous jury instruction on refusal to take breath test

14

did not cause defendant harm given officer's eye-witness testimony of intoxication).

### c. The Relevance of Hawkins's Flight

We also find no harm from both parties addressing evidence of Hawkins's failure to appear at his initial trial as a consideration of his guilt. *See Ransom v. State*, 920 S.W.2d 288, 299 (Tex. Crim. App. 1994) (recognizing the well-established rule that acts "designed to reduce the likelihood of prosecution, conviction, or incarceration for the offense on trial" are admissible to show a "consciousness of guilt"), *cert. denied*, 519 U.S. 1030 (1996). Indeed, once the trial court admitted testimony of Hawkins's flight, both parties were free to argue the facts surrounding Hawkins's failure to appear at his earlier-scheduled trial. *Hess*, 224 S.W.3d at 515–16. And given the gravity of the evidence of Hawkins's flight, the jury did not need any judicial instruction to focus its attention on it. *See Brown v. State*, 122 S.W.3d 794, 803 (Tex. Crim. App. 2003) (reasoning that jury did not need erroneous instruction of inferring defendant's intent given evidence "on the various statements appellant made the night he killed [victim] or the various acts he performed both before and after the shooting"), *cert. denied*, 541 U.S. 938 (2004); *see also Hess*, 224 S.W.3d at 517 ("the jury did not need [the erroneous] instruction to focus its attention on the refused test . . . . [T]he advocates quite competently did so on their own").

Although the State referred to evidence of Hawkins's flight twice during its closing, the record demonstrates that the prosecution did not emphasize the

court's instruction, focus the jury's attention on that instruction, or exploit the instruction by placing the weight of the trial court behind it. *Hess*, 224 S.W.3d at 517.

### d. No Harm

We hold that the trial court's erroneous instruction did not affect the very basis of this case, deprive Hawkins of a valuable right, or make the case for conviction clearly and significantly more persuasive. *Taylor*, 332 S.W.3d at 490 (citing *Almanza*, 686 S.W.2d at 172). We overrule Hawkins's first point.

### B. The Fines are Included in the Court's Judgments

In his second point, Hawkins argues that the trial court did not orally pronounce the jury's assessed fines and that the trial court's judgments reflect a fine for each of his convictions. Hawkins argues that the court's alleged oral pronouncement trumps the written judgments and thus this court should reform the trial court's judgments to reflect no fines. *See Coffey v. State*, 979 S.W.2d 326, 328 (Tex. Crim. App. 1998) ("[W]hen there is a variation between the oral pronouncement of sentence and the written memorialization of the sentence, the oral pronouncement controls.").

The State argues that the *Coffey* rule does not apply in this case because the trial court's pronouncement is not in conflict with its written judgments; rather, its oral pronouncement was ambiguous. *See Aguilar v. State*, 202 S.W.3d 840, 843–44 (Tex. App.—Waco 2006, pet. ref'd) (holding that trial court's omission, during its oral pronouncement of sentence, of express reference to count of

16

indictment that formed basis for court's cumulation order rendered pronouncement ambiguous but did not "create a conflict sufficient to invoke the rule of *Coffey* and its progeny"). Further, the State argues that Hawkins interfered with the trial court's oral pronouncement of its judgment and that Hawkins should not benefit from his own invited error. *See Beasley v. State*, 634 S.W.2d 320, 321 (Tex. Crim. App. [Panel Op.] 1982) ("A defendant may not create reversible error by his own manipulation."). We agree with the State.

A defendant's sentence must be pronounced orally in the defendant's presence. Tex. Code Crim. Proc. Ann. art. 42.03, § 1(a) (West Supp. 2016); *Taylor v. State*, 131 S.W.3d 497, 500 (Tex. Crim. App. 2004). The judgment, including the assessed sentence, is the "written declaration and embodiment of that oral pronouncement." *Taylor*, 131 S.W.3d at 500; *see* Tex. Code Crim. Proc. Ann. art. 42.01, § 1 (West Supp. 2016). When the oral pronouncement of a sentence and the sentence in the written judgment conflict, the oral pronouncement controls. *Taylor*, 131 S.W.3d at 500; *Coffey*, 979 S.W.2d at 328. But not every variation between the oral pronouncement and the judgment will necessarily invoke this rule. *Aguilar*, 202 S.W.3d at 843. Rather, only "if there is a conflicting variation, the oral pronouncement will control." *Id.* Where the variation does not create a conflict sufficient to invoke the rule of *Coffey* and its progeny, the jury's punishment verdict, the court's pronouncement, and the written judgment should be read together in an effort to resolve the ambiguity. *Id.*

17

In this case, the trial court read aloud the jury's assessed punishments for both counts of the jury's verdict for aggravated assault with a deadly weapon—including reading both the incarceration periods and the $1,000 fine for each count. After announcing to all parties that it would receive and accept the jury's verdicts, the trial court then proceeded to orally pronounce its judgment. During the trial court's pronouncement, Hawkins became defiant and belligerent and he began to verbally express disapproval, using expletives, of the jury's verdict. And despite Hawkins's arguments on appeal, we agree with the State's characterization that Hawkins became so disruptive that after multiple warnings by the trial court, the trial court ordered Hawkins removed from the courtroom. The trial court's judgments reflect the jury's assessed punishments, including the fines to each count.

We conclude that the trial court's oral pronouncement is ambiguous, and we also conclude that Hawkins invited this ambiguous result. *See Aguilar*, 202 S.W.3d at 843; *see also Beasley*, 634 S.W.2d at 321. We read the jury's verdicts, the trial court's oral pronouncement, and the written judgments together to include the fines in the judgments. *See Aguilar*, 202 S.W.3d at 843. We overrule Hawkins's second point.

**C.     The Statutory Language in the Court's Charge on Punishment**

In his third point, Hawkins argues that his rights to due process and due course of law were violated when the trial court included, in its charge to the jury at the punishment phase, the statutory instruction regarding the impact of good-

18

conduct time on a defendant's incarceration. *See* Tex. Code Crim. Proc. Ann. art. 37.07(4)(a) (West Supp. 2016) (defining statutorily mandated jury-charge instruction language at punishment when a deadly-weapon finding has been made); *see also* U.S. Const. amends. V, XIV; Tex. Const. art. I §§ 13, 19. Hawkins's argument is that because an individual serving a sentence for aggravated assault with a deadly weapon is "not eligible to accumulate good conduct time credits," the instruction to the jury was misleading. *See* Tex. Gov't Code Ann. § 508.145(d)(1) (West Supp. 2016) (modifying and minimizing the impact of good-conduct time for certain offenses, including aggravated assault with a deadly weapon).

The State points out, and Hawkins concedes, that the trial court and this court are bound by the Texas Court of Criminal Appeals's precedent, which dictates that a trial court is required by statute to include the very instruction that Hawkins complains of. *See Luquis v. State*, 72 S.W.3d 355, 363 (Tex. Crim. App. 2002) ("The Texas Legislature enacted legislation that *requires* the trial judge to instruct the jury in the precise wording that the statute recites."). [Emphasis in original.] Nonetheless, Hawkins argues that we should reverse his conviction for a new punishment hearing because the trial court included the statutorily mandated language. *See* Tex. Code Crim. Proc. Ann. art. 37.07(4)(a)

This Court "is bound by the precedent of the Texas Court of Criminal Appeals and has no authority to disregard or overrule" its holdings. *Sierra v. State*, 157 S.W.3d 52, 60 (Tex. App.—Fort Worth 2004), *aff'd*, 218 S.W.3d 85

19

(Tex. Crim. App. 2007). Thus, we decline Hawkins's invitation to usurp the Texas Court of Criminal Appeals and we overrule his third point.

## IV. CONCLUSION

Having overruled Hawkins's three points, we affirm the trial court's judgments.

/s/ Bill Meier
BILL MEIER
JUSTICE

PANEL: WALKER, MEIER, and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: August 25, 2016

20